## In re DAILY'S WILL.

(*Surrogate's Court, Kings County.*   July 15, 1889.)

WILLS—PROBATE—EVIDENCE.

On application to probate a will which gave testatrix's husband all her personal property absolutely, and the use of her realty for life, to be divided among her relatives *per capita* at his death, there was evidence that testatrix was on bad terms with her husband's relatives, and desired to cut them off, and that she did not wish her husband to know that she was executing a will; that the will was intrusted to a subscribing witness to be by him kept in secrecy for a year after testatrix's death. Though this witness was of bad character, another subscribing witness and the lawyer who drew the will testified, and their testimony was undisputed. The estate consisted only of about $2,500 worth of realty and a little personalty. Neither of the subscribing witnesses nor the draughtsman derived any benefit under the will, and did not know of testatrix's death at the time thereof. *Held*, that the will was not shown to be a forgery, and should be admitted to probate, though a former will had been probated before it was produced, which was a year after testatrix's death; the evidence showing that the proponent did not know of its existence until then.

On application to probate the will of Ann Daily, deceased.

*John H. Kemble*, for proponent.   *James J. Rogers*, for contestants.

ABBOTT, S.   Ann Daily died on the 21st of March, 1887, leaving her surviving no children nor descendants, but a husband, Michael Daily. At the time of her death her estate consisted of a two-story frame house and lot in Leonard street, Brooklyn, worth about $2,500, and a little personal property. On the 22d of November, 1882, she executed a will, in and by which she left all her property, both real and personal, to her husband absolutely. This will was admitted to probate on the 18th day of April, 1887, and letters testamentary were issued to the husband, Michael Daily, who qualified as executor. He died on the 27th of July, 1887. On the 12th of January, 1888, one Catherine Nohr, a sister of the deceased husband, Michael Daily, petitioned to have the will of Ann Daily re-probated, on the ground that, through some error, one John Cunningham, a necessary party, had not been cited on the former application. On the return-day of the citation, objections to the re-probate were filed by said Cunningham. The matter was adjourned from time to time until February 10, 1888, when the subscribing witnesses were re-examined. The contest proceeded, and on the 21st day of March, 1888, another paper purporting to be the last will and testament of Ann Daily, bearing date the 14th day of September, 1886, was offered for probate by the executor, one William Kelly, a nephew of Ann Daily, deceased.

It is claimed by the proponents of the first will that this second paper is a forgery, and whether it is or not is the only question I am called upon to decide in this controversy. The parties on one side are the heirs at law of the husband, and on the other the relatives of the wife. This case was tried before my predecessor. One of the subscribing witnesses to the second paper, Charles H. Dorans, was partly examined before me; and of my own motion I recalled the other subscribing witness, Andrew J. Clark, and the lawyer who drew the will, Henry C. Beach, that I might see and examine them personally. The second paper appears to have been drawn and executed in the office of Henry C. Beach, in Sixth avenue, New York city.

The evidence tends to show that Ann Daily was not on good terms with her husband's relatives. She evidently desired that her husband should be kept in ignorance of the fact that she was about to execute another will, and in my judgment the course which she pursued was in exact conformity with this intention. She had taken some tickets from her nephew, William Kelly, to dispose of for some church charity. She had collected the money for them, and went to New York with the twofold object of turning over to Kelly this money which she had collected, and of seeing about making another will. Kelly was superintending some paving work on Eighteenth street, and when

she arrived there he had gone to dinner.   Charles H. Dorans and Andrew J. Clark also came to see Kelly about this time, and she entered into conversation with them.   Clark was intimate with Kelly's family, and had known Mrs. Daily for many years.   Kelly returned shortly after, and she stepped aside with him and had some conversation about the money she had brought for him; then, returning to Clark, she told him she wanted to get a paper drawn up, as she was not feeling very well, and asked him if he knew where Mr. Waterbury's office was.   He told her he did; and, after some talk with her about the contents of the paper she wished drawn, he said to her: "If you go to Mr. Waterbury, he is Mr. Kelly's confidential lawyer, and, if you want to keep anything quiet from him, I think you had better get some one else." After mentioning some other lawyers, she concluded to go up and see Mrs. Kelly, her nephew's wife, who lived up-town.   It does not appear from the evidence that William Kelly heard or knew of this conversation between Ann Daily and Clark.   She then took the Thirty-Fourth street cars to go up to Mrs. Kelly's, and Dorans and Clark accompanied her.   At this time she appears to have had no idea of going to Beach's office.   On the way up Dorans suggested Beach as a lawyer who could draw the paper for her, and at Thirty-Fourth street they left the car they were in and took a Sixth-Avenue car down to Beach's office, at No. 46 Sixth avenue, where the will was drawn and executed.

If she had desired to cut off her husband's relatives, the will was the most equitable one she could possibly have made.   It gives her husband all the personal property absolutely, and the use of the real property for life, and at his death she devises it equally among her relatives *per capita*.   After the will was drawn and executed, she, not desiring her husband to know about or see it, intrusted it to Dorans, being ignorant of his character, and only knowing him as an acquaintance of her nephew, to be kept by him in secrecy for a year after her death, which, under all the circumstances, does not seem to have been an unnatural thing to do.   The ignorance on Kelly's part of the making of the will, and the ignorance of both Dorans and Clark of the death of Ann Daily, accounts for its non-production about the time of her death.   Kelly did not know she had made a will, and Dorans and Clark did not know she was dead.   I am inclined to believe, from the evidence, and from what I have seen of him, that the character of the witness Dorans is as bad as the counsel for the proponents of the first will seems to regard it; but I am inclined to give credence to so much of his testimony in this matter as relates to the preparation and execution of the paper in question.   The material testimony of the witness Clark and the lawyer, Beach, is undisputed, and in my opinion is entitled to full credit.

It does not seem possible or credible to me, especially in view of the amount of the estate, that this elaborate conspiracy should have been entered into by so many people, where the chief conspirators can derive no possible advantage from it, and the share of those deriving any benefit is so small as to be unlikely to induce them to risk the penalty attending forgery and perjury. Therefore I have decided to admit to probate the paper last propounded.